# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GODFREY D. HENNEGHAN**                    *

**Plaintiff(s)**                    *

    **vs.**                    *        **Civil Action No.   07-2173 (HHK)**

**DISTRICT OF COLUMBIA**                    *

**Defendant(s)**        *****

## PLAINTIFF RESPONSE TO DEFENDANT'S MOTION TO DISMISS

In response to Defendants Motion To Dismiss, Plaintiff Henneghan hereby state that this

is a civil action arising out of discrimination and retaliation by Defendant District of Columbia in

the Division of Public Education of the D.C. Public Schools ("DCPS").  Plaintiff Godfrey D.

Henneghan ("Henneghan") brings this action against Defendants the District of Columbia ("the

District"), DCPS, and agencies of the District for discrimination and retaliation on the basis of

disability in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

("Section 504) and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("the

ADA) and the Individuals with Disabilities Education Act (IDEA) for failing to provide a Free

and Appropriate Public Education (FAPE) to the son of Plaintiff Henneghan who is now a 14

year old child named Malcolm Henneghan who is a student enrolled at Defendant District of

Columbia Public School ("DCPS") school system as a learning disabled student.  This action is

brought under Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with

Disabilities Act, and Title VII of the Civil Rights Act of 1964 with respect to Plaintiff

Henneghan child Malcolm Henneghan who is a student in a public educational institution.

## SOCIAL BACKGROUND FOR MALCOLM HENNEGHAN

Malcolm Shakeal Henneghan is 14 years old, born on February 21, 1994 in Washington D.C. at D.C. General Hospital. Malcolm is an eighth grade student attending Kelly Miller Middle School (DCPS) located in Washington D.C.

Malcolm's father, Godfrey D. Henneghan is a 45-year-old single parent. Godfrey and Malcolm are both residence of Washington D.C. residing at the home of Sarah E. Henneghan, who is Godfrey Henneghan's Mother and Malcolm Henneghan Grandmother located at 5814 Clay Street N.E., Washington D.C. 20019. Malcolm has an older brother who is 23 years old named Stephen Henneghan who also resides at their home.

Godfrey and Malcolm, (father and son), Sarah and Stephen Henneghan (grandmother and Malcolm's older brother) have a normal family relationship living in the same house. Malcolm has his own bedroom, which is his own private space. Malcolm eats nutritionally well living in a house with plenty of food. Malcolm has a complete wardrobe for every season. Malcolm lives in a household that's full of love.

### MEDICAL HISTORY

On the snowy night of February 21, 1994, temperature in the low 20's, Vanessa Henneghan (biological Mother) was picked up off the streets by emergency medical service in Northeast DC and taken to D.C. General Hospital Detoxification Unit and treated for crack cocaine abuse . Shortly after arriving in Detox, Vanessa went into labor and Malcolm Henneghan was born.

Malcolm Henneghan was born in 31 weeks premature with cocaine in his system. Malcolm was underdeveloped at birth and place in the intensive care unit in the boarder baby ward located at D.C. General Hospital and placed on withdrawal medication.

## MALCOLM HENNEGHAN ABANDON SHORTLY AFTER BIRTH

Malcolm stayed in the intensive care unit for a little over a month until he was taken out of the hospital unauthorized by his biological mother Vanessa Henneghan. One week later Malcolm was left abandon for about seven days in a apartment by his biological mother.

Malcolm was brought to our house around 2:00am on Saturday morning in April 1994 at the age of two months by an associate of Vanessa Henneghan (Malcolm's biological mother) telling us that he has not seen Vanessa over a week and that the baby was left alone in an apartment and has no food or diapers.

Malcolm was taken to D.C. General Hospital after being abandon. Malcolm was diagnosed as being dehydrated and malnourished and weighing 3lbs. 7 oz.

### CHILD PROTECTIVE SERVICES

On the night that Malcolm Henneghan was brought to our house by an associate of Vanessa Henneghan (Malcolm's biological mother). Godfrey D. Henneghan and Christine Henneghan, husband and wife (and biological uncle and aunt by marriage) started to immediately care for Malcolm Henneghan. After being abandon in an apartment and being diagnosed as malnourished and dehydrated, I Godfrey D. Henneghan, contacted Child Protection Services, to informed them that Malcolm Henneghan, a two month old child was abandon in an apartment by my sister Vanessa Henneghan, biological mother of Malcolm and that he was badly malnourished and dehydrated. Child Protective Services immediately gave my wife and I temporary custody of Malcolm Henneghan.

### CONSENT OF NATURAL MOTHER TO ADOPTION

Malcolm Henneghan stayed in the temporary custody of Godfrey & Christine Henneghan for three (3) years until Vanessa Henneghan (Malcolm's biological mother) relinquished her

parental rights. On March 7, 1997 at the Superior Court of the District of Columbia Family

Division, Godfrey D. Henneghan and Christine Henneghan became the legal Parents of Malcolm

Henneghan. Vanessa Henneghan (biological mother), stated on the CONSENT OF NATURAL

MOTHER TO ADOPTION, "I, Vanessa Henneghan, being the natural mother of the minor child

Malcolm Henneghan, born on February 21, 1994, in Washington D.C. out of wedlock, do hereby

consent to the legal adoption of my child by the Petitioner(s) Godfrey and Christine Henneghan,

being fully aware that in the event the Petition for Adoption is granted by this Court, the minor

child's name will be changed to that of the Petitioner(s). I do request for the best interests of my

minor child that the Petition be granted and that a Decree be entered legalizing the adoption of

the miner child by the Petitioner(s). Judge, Arthur L Burnett, Sr. (Superior Court of the District

of Columbia) stated "I Aruthur L. Burnett, Sr. a Judge for the Superior Court of the District of

Columbia in and for whose name is signed above, has read the consent form and knows the

contents of it, and that the statements made in it are true to the best of her knowledge and belief.

Subscribed and sworn to before me on March 7, 1997" The Adoption Petition was signed by

Judge Arthur L Burnett Sr.

## TRAUMATIC EVENTS

In November of 1998, one year after becoming Malcolm's parents, Christine Henneghan,

wife of Godfrey Henneghan and new mother of Malcolm left abruptly and abandon her marriage

as wife and mother of Godfrey and Malcolm Henneghan. Since Malcolm was 2 months of age

up until 4 years old (when Christine left), the only mother and father he knows is Christine and

Godfrey Henneghan.

Since Malcolm was 2 months old up until he was 4 years old, Christine Henneghan has

been Malcolm's mother in a temporary and permanent capacity. As a homemaker, Christine

4

took care of all of Malcolm needs as a stay at home Mom.  Christine cared for Malcolm like any loving mother would.  She constantly provided love and care for Malcolm and was around him most of the time as Godfrey worked and was not at home during the day.

When Christine abruptly up and left our marriage in November of 1998, Malcolm Henneghan, 4 years old at the time was devastated and traumatized.  Malcolm cried for Christine all of the time.  The crying lasted for months.  Malcolm stopped eating, and had problems holding food in his stomach.  Malcolm was not talking in complete sentences and always had problems saying words clearly but developed a stuttering problem that lasted for several years after Christine left.  Christine discovered that she was gay.  Christine met a women on the Internet, moved to her house in North Carolina and we have not seen her in 10 years.

In October of 2001, Vanessa Henneghan (biological mother of Malcolm Henneghan) died at Washington Hospital Center.  Malcolm did not know that Vanessa was his biological mother until several years after her death.

## PARENTAL OBSERVATION OF MALCOLM'S DEVELOPMENT

I Godfrey D. Henneghan hereby state that the information I am about to declare regarding my child Malcolm Henneghan is true and nothing but the truth:

(a)     Malcolm did not start talking until he was 5 years old and even at that age his words were not pronounce clearly enough to understand what he is saying.

(b)     I have been helping Malcolm dress himself up until 12 years of age.

(c)     Malcolm could not tie his shoe's until he was about 12 years old.

(d)     Malcolm is 14 years old now and cannot run his own bath water without assistance.

(e)     Malcolm is 14 years old and in the eighth grade and cannot tell time unless the clock is digital. He is unable to read the time on an analog or non-digital clock.

(f)     Malcolm is 14 years old and in the eighth grade and is unable to shop and make purchases on his own. He is unable to count the correct dollar amount in his hand to match the price of merchandise he wants to purchase. He is unable to count dollars and cents if the bills are different and the coins are different.

(g)     In January of this year Malcolm asked me (Godfrey Henneghan) "Dad, how much is $2.50 plus 2.50"

(h)     Malcolm is in the eighth grade and his reading and comprehension is on a 3rd or 4th grade level.

## AURGUMENT

Malcolm Henneghan was first detected of experiencing academic difficulties in the first grade. Malcolm had problems in speech with pronouncing words, he had difficulties writing and reading.

When Malcolm Henneghan was in the second grade attending Burrville Elementary School, (DCPS) he was classified as 504 and was identified as having learning disabilities in math, reading writing and speech. Because Malcolm Henneghan was identified as 504 with problems in math, reading, and writing, Burrville Elementary School (DCPS) did not enroll Malcolm Henneghan into summer school because (DCPS) does not have summer school for 504 children. There are no specially trained teachers who teach 504 children in summer school at DCPS.

While Malcolm Henneghan was in the third grade attending Burrville Elementary School, (DCPS) he continued to be classified as 504 with learning disabilities in math, reading, writing

6

and speech. Because Malcolm Henneghan was identified as 504 with problems in math, reading, and writing, Burrville Elementary School (DCPS) did not enroll Malcolm Henneghan into summer school because (DCPS) does not have summer school for 504 children.  There are no specially trained teachers who teach 504 children in summer school at DCPS.

When Malcolm Henneghan was in the fourth grade attending Burrville Elementary School (DCPS) he continued to be classified as 504 with learning disabilities in math, reading, writing and speech. Because Malcolm Henneghan was identified as 504 with problems in math, reading, and writing, Burrville Elementary School (DCPS) did not enroll Malcolm Henneghan into summer school because (DCPS) does not have summer school for 504 children.  There are no specially trained teachers who teach 504 children in summer school at DCPS.

When Malcolm Henneghan was in the fifth grade attending Burrville Elementary School (DCPS) **unlawfully removed Malcolm Henneghan out of 504/Special Education without Plaintiff Henneghan's consent or knowledge.**

As a learning disable child with impairments in reading, writing, math and speech, Malcolm Henneghan was forced to survive the entire 5th grade at Burrville Elementary School (DCPS) without recognizing and accommodating any of his handicaps with regards to learning.

During the fifth grade school year at Burrville Elementary (DCPS), Plaintiff Henneghan started to notice that Malcolm was no longer getting help for his learning disabilities in math, reading, writing and speech.

Plaintiff Henneghan contacted the Special Education Coordinator, Edith Eastman-Ajaero, located at Burrville Elementary School (DCPS) and informed her that my child Malcolm Henneghan has been taken out of 504/Special Education without my knowledge or consent and that my child is unable to learn without Burrville Elementary School (DCPS) recognizing and

7

accommodating his disabilities. Plaintiff Henneghan demanded that his child be placed back into 504/Special Education.

As a result of Plaintiff Henneghan written complaints to the Special Education Coordinator, Edith Eastman-Ajaero located at Burrville Elementary School (DCPS) stating that my child Malcolm Henneghan has been taken out of 504/Special Education without my knowledge or consent. The Special Education Coordinator, Edith Eastman-Ajaero informed Plaintiff Henneghan that a Multidisciplinary Team Meeting will be held on June 8, 2004 at Burrville Elementary School (DCPS) to address my concerns regarding my child being taken out of 504/Special Education without my knowledge or consent..

On June 8, 2004, the last month of the school year, Plaintiff Henneghan met with the Multidisciplinary Team Meeting located at Burrville Elementary School (DCPS). The Multidisciplinary Team consisted of the parent Plaintiff Henneghan, Natalle Johnson, General Education Teacher, Edith Eastman Ajaero, Special Education Coordinator, Chestivia Shoemaker, LEA Counselor, Emma Curry, Principal/Principal Designee, Leslie Charles, Speech and Language Pathologist, Kimberly Lewis, Speech Language Therapist and Anna Rease, Reading Resource Teacher.

The Multidisciplinary Team determined that Malcolm Henneghan is experiencing academic difficulty in the area of reading and math. He has problems in the area of speech and handwriting.

The Multidisciplinary Team met and recommended the following assessments to be ordered:

a)      Psycho-ed.

b)      Speech/Language Evaluation

c)      Occupational Therapy Evaluation

d)      Audiology Evaluation

e)      Hearing Screening

f)      Vision Screening

g)      Social History

The reason the Multidisciplinary Team Meeting was held on June 8, 2004 the last month

of the school year at Burrville Elementary School (DCPS) was due to my written complaints

with respect to DCPS taking my child out of 504/Special Education the entire fifth grade school

year without my knowledge or consent. The Multidisciplinary Team assured Plaintiff

Henneghan that Malcolm Henneghan will be evaluated and tested during the summer of 2004

and that their would be another Multidisciplinary Team Meeting before the end of the summer so

that Malcolm can start receiving services at the beginning of the 2004-2005 six grade school

year.

On June 26, 2004, one week before the 2004-2005 school year began, the

Multidisciplinary Team met to discuss the results of the evaluations given to Malcolm

Henneghan during the summer of 2004. The meeting convened and all discipline specialists

introduced themselves to the parent. The Procedural Safeguards Manual was issued and a

summary of the parental rights was given. A receipt for the manual was obtained. The purpose

of the meeting was stated:  To review the current assessments and determine the student's

eligibility for special education and related services. If the student is found eligible, the team

will devise an IEP and discuss placement. On his IEP all of the Multidisciplinary Team

participants in the development of the IEP introduced themselves and agreed to the information

contained in the IEP. Plaintiff Henneghan introduced himself as the parent of Malcolm

Henneghan, the School Psychologist introduced himself to Plaintiff Henneghan via telephone conference, the Special Education Teacher introduced herself, the Social Worker introduced herself, and the Speech Pathologist introduced herself. All of the above mention professionals were their and agreed to the contents of the IEP. Plaintiff Henneghan received a copy of everyone's signature that introduced themselves and who agreed to the contents of my child's IEP.

During the Multidisciplinary Team meeting, the Speech Therapist stated: **Results of assessments revealed that Malcolm's receptive vocabulary skills to be in the "below average" range and expressive vocabulary skills to be in the "average" range. Significant deficits were evident in expressive language and receptive language. Results of the ITPA revealed deficits in Malcolm's spoken language. Processing and Reasoning revealed significant deficits in his ability to reason, develop ideas, draw inferences and solve problems. Pragmatic language skills were characterized by poor eye contact and limited spontaneous conversational speech. Articulation, voice and fluency were appropriate for Malcolm's age, gender, and linguistic environment. Intervention is recommended for one hour per week to address noted areas of deficiency.**

Leslie J Charles, M.S. Speech-Language Pathologist revealed on the Speech and Language Evaluation Report for Malcolm Henneghan the following results:

**CORE LANGUAGE SCORE**

- **Concepts and following Directions**
- **Recalling Sentences**
- **Formulated Sentences**
- **Word Classes 2-Total**

Malcolm received a Core Language score of 67. This places Malcolm in the "very low/severe" range of functioning.

## RECEPTIVE LANGUAGE INDEX

- **Concepts and following Directions**
- **Word Classes 2-Receptive**

Malcolm received a Receptive Language Index of 76 placing his skills in the "low" range of functioning.

## EXPRESSIVE LANGUAGE INDEX

- **Recalling Sentences**
- **Formulated Sentences**
- **Word Classes 2-Expressive**

Malcolm received an Expressive Language Index or 65 placing his skills in the "very low/severe" range of functioning.

## LANGUAGE CONTENT INDEX

- **Word Classes 2-Total**
- **Word Definitions**
- **Understanding Spoken Paragraphs**

Malcolm received a Language Content index of 84. This places Malcolm in the borderline range of functioning.

## LANGUAGE MEMORY INDEX

- **Concepts & Following Directions**
- **Recalling Sentences**
- **Formulated Sentences**

11

Malcolm received a Language Memory index of 62. This places Malcolm in the very low range of functioning.

SUBTEST SCORES

On the Concepts and Following Directions subtest, Malcolm's score reveals his inability to interpret, recall and execute oral directions with modifiers at an age appropriate level. Students who perform in the below average range on this subtest may experience home and school-related difficulties in following directions. Curricular workbooks require the student to be able to follow directions that include basic linguistic concepts such as coordinating conjunctions (and, but, or), references to inclusion/exclusion, time (when, after, before), condition (that is not), or quantity (some, one, none). Early math story problems age good examples of the need for accurate interpretation of key concepts and the recall of directions and instructions for academic success. These students may also have problems following workbook assignments in subject areas and may have difficulties taking notes or writing messages.

Malcolm's performance on the Recalling Sentences subtest can be attributed to his poor ability to immediately recall spoken language. This task is associated with tasks such as writing from dictation, taking notes, remembering the teacher's instructions, and copying from the chalkboard.

On the Formulated Sentences subtest, Malcolm's score indicates that he has difficulties in the generative language aspects related to planning and producing sentences for conversation, classroom discourse, academic interactions, and written language.

The Word Classes 2 subtest is used to evaluate the student's ability to understand relationships between words that share a variety of functional and conceptual

12

relationships. **On the Word Classes 2 subtests Malcolm's score indicates he cannot associate related words automatically or efficiently. Adequate ability to perceive relationships in the meaning of words and form word associations is essential for classroom listening and reading comprehension. Deficits in recognizing and using word associations influence a child's ability to make predications, create meaning, make inferences and use analogical reasoning for problem solving.**

**The Word Definitions subtest is used to evaluate the student's expressive vocabulary. The student is orally presented a word, followed by an introductory sentence that includes the word. The student is then asked to define the word using descriptive language. Malcolm received a scaled score of 8 on the Word Definitions subtest.**

## RECOMMENDATIONS

Results of assessments administered reveal Malcolm's abilities in the area of communication:

- Receptive vocabulary skills to be in the "below average" range and expressive vocabulary skills to be in the "average" range. (CREVT-2)

- Language skills as assessed by the CELF-4 revealed significant deficits in expressive and receptive language skills.

- The ITPA-3 revealed Malcolm's poor ability to communicate using speech and deficits in phonological awareness that will impact upon Malcolm's reading skills.

- The TARPS revealed Malcolm's significant difficulties in processing and reasoning skills.

- Articulation, voice and fluency were appropriate for Malcolm's age, gender and linguistic environment.

- Pragmatic language skills are characterized by poor eye contact and limited spontaneous conversational speech.

Noted areas of deficit will significant impact on Malcolm's ability to utilize communication skills necessary for academic success.  Intervention services are recommended for one hour per week to address noted area of deficiency.  It is also recommended that Malcolm be receive a psycho-educational evaluation to evaluate cognitive and academic levels for appropriate educational planning.

## PSYCHOEDUCATIONAL EVALUATION REPORT

### by Anthony White, M.S., DCPS School Psychologist

## ANALYSIS OF TEST RESULTS

### Cognitive Functioning:

Malcolm's unique set of thinking and reasoning abilities make his overall intellectual functioning difficult to summarize by a single score on the Wechsler Intelligence Scale for Children—Third Edition.  His nonverbal reasoning abilities are much better developed than his verbal reasoning abilities.  Processing complex visual information by forming spatial images of part-whole relationships and/or by manipulating the parts to solve novel problems without using words is a relative strength for Malcolm.  Comprehending verbal information, however, and using verbal abilities to solve new problems are weaknesses.  His verbal reasoning abilities are in the intellectually deficient range and above those of approximately 1% of his peer (VIQ = 65; 90% confidence interval = 62 – 72).  His nonverbal reasoning abilities are in the low average range and better than those of approximately 19% of his peers (PIQ = 87; 90% confidence interval = 81 – 95).

This pattern is often found among students who are having problems learning in school because the majority of educational instruction involves some form of verbal learning. The instructional tasks may be explicitly verbal (e.g., listening, presenting, explaining) or implicitly verbal (e.g., reading, writing, solving word problems).

Malcolm's subtest score pattern suggests relative strengths in the ability to solve problems quickly and accurately using a trial-and-error approach, and the ability to solve problems that require abstract reasoning.

Malcolm's performance was significantly better n the Object Assembly and Block Design subtests, and significantly weaker on the Coding subtest than his own mean score for all nonverbal reasoning tasks. Futher, he performed better than most of his age-mates, thus demonstrating strong abilities on the Object Assembly subtest. His week performance on the Coding subtest was far below that of most children his age.

Malcolm was required to put together puzzle pieces to form line drawings of common objects on the Object Assembly subtest. His performance on this particular subtest is an indication of his general ability in perceptual organization tasks, that is, tasks that require mentally organizing nonverbal, spatial information into meaningful part-whole relationships. Performance on this task also may be influenced by visual-motor ability (Object Assembly scaled score=13). The Block Design subtest required Malcolm to use two color cubes to construct replicas of two-dimensional, geometric patterns. This subtest assesses ability to mentally organize visual information. More specifically, this subtest assesses his ability to analyze part-whole relationships when information is presented spatially. Performance on this task also may be influenced by visual-spatial perception and visual perceptionfine motor coordination, as well as planning ability (Block Design scaled score=11).

The Coding subtest required Malcolm to use a key to associate a series of symbols with a series of shapes and to use a pencil to draw the symbols next to the shapes. A direct test of speed and accuracy, the Coding subtest assesses ability in quickly and correctly scanning and sequencing simple visual information. Performance on this subtest also may be influenced by short-term visual memory, attention, or visual-motor coordination (Coding scaled score=3).

Malcolm achieved his best performance among the verbal reasoning tasks on the Similarities subtest and lowest score on the Comprehension subtest. His performance across these areas differs significantly and suggests that these are the areas of most pronounced strength and weakness, respectively, in Malcolm's profile of verbal reasoning abilities. Although better developed than his other verbal reasoning abilities, Malcolm's ability on the Similarities subtest was below that of most children his age. His weak performance on the Comprehension subtest was far below that of most children his age.

On the Similarities subtest Malcolm was required to respond orally to a series of word pairs by explaining how the words of each pair are alike. This subtest examines his ability to abstract meaningful concepts and relationships from verbally presented meterial (Smilarities scaled score=6).

The Comprehension subtest required Malcolm to provide oral solutions to everyday problems and to explain the underlying reasons for certain social rules or concepts. This subtest provides a general measure of verbal reasoning. In particular, this subtest assesses his comprehension of social situations and social judgment as well as his knowledge of conventional standards of social behavior (Comprehension scaled score=1).

**Academic Functioning:**

16

On 8/25/04, Malcolm completed the Woodcock-Johnson III Tests of Achievement (W-J III) which assesses his current level of functioning in specific academic areas.

**Reading**

Malcolm performed in the low average range in overall readig skills, as indicated by his standard score in Broad Reading (83). His skills in this area exceed those of only approximately 13% of students his age. Malcolm performed comparably on tasks that required him to correctly read a series of printed words (Letter-Word Identification standard score=84)

**Mathematics**

In overall mathematics skills Malcolm performed in the low range, as indicated by his Broad Math standard score (76). His achievement in this area is better than approximately 6% of students his age. Malcolm's performance on tasks that required him to add and subtract numbers up to three digits and to multiply and divide two-digit numbers (Calculation standard score=88) was significantly better than his performance on tasks that required him to understand number and consumer math concepts, geometric measurement, elementary graph reading, basic graph usage, and simple one-step word problems (Applied Problems standard score=72). Malcolm demonstrated the ability to add, subtract, and multiply one digit numbers. Malcolm had difficulty completing math operations that required regrouping.

**Writing**

In overall writing skills, Malcolm performed in the low average range, as indicated by his scores on the Spelling and Writing Fluency subtests. Malcolm displayed adequate writing skills on the Writing Fluency subtest where he attained a standard score of 71. He demonstrated poorly develped writing skills and he frequently failed to use appropriate capitalization and

punctuation. On tasks that required him to correctly spell verbally presented words, Malcolm performed in the average range. He achieved a standard score of 72 on the Spelling subtest.

## Perceptual-Motor Functioning:

On the VMI, a visual-motor perception/intergration test requiring the copying of geometric designs, Malcolm performed approximately 3 years below his chronological age. He attained a standard score of 85 and an age equivalent of 7.6 years old. His perceptual motor skills are adequate for his age level.

## Summary:

Malcolm is a 10-year old child who completed a psychoeducational evaluation. His overall cognitive ability, as evaluated by the WISC-III, cannot easily be summarized because his nonverbal reasoning abilities are much better developed than his verbal reasoning abilities. Malcolm's reasoning abilities on verbal tasks are generally intellectually deficient (VIQ=65), while his nonverbal reasoning abilities are significantly higher and in the low average range (PIQ=87). When compared to other at his age level, Malcolm's academic skills are within the low average range. His fluency with academic tasks is low. Malcolm's performance is low average in reading and math calculation skills, and low in mathematics.

## Recommendations:

(1)     A multidisciplinary conference will be held to evaluate Malcolm's current level of functioning and to plan appropriate educational services.

(2)     Strategies by which Malcolm can expand both his sight-word vocabulary and his spelling ability should be developed.

(3)     Malcolm's activities can be shortened and then lengthened. If he is completing three of ten arithmetic problems, for example, the teacher might give him five

instead of ten problems to complete and gradually increase the number of problems that are presented.  Malcolm can keep a record of the number of problems completed and graph these results to see his improvement.

(4)    Malcolm should practice weekly spelling and sight-vocabulary words with different modalities.  A computer, chalkboard, or even plastic magnetic letters could be used to provide motivation.  Rehearsal and practice would stregthen Malcolm's visual memory abilities.

(5)    In place of oral spelling tests, Malcolm should be provided a worksheet with mixed spelling words that would allow him to recognize and circle the correctly spelled word.  He could then construct sentences using the correctly spelled words.

(6)    Malcolm should receive small group instruction in the area of written expression.

(7)    If possible, Malcolm should be provided the use of computer aided learning of vocabulary words.  If he enjoys video games, learning can be integrated into this fun activity.

(8)    Malcolm should learn a new vocabulary word each day and keep a record of the words that he has learn.

**SUMMARY:**

**Based upon the documents received, the MDT team determined that the student qualifies for special education services under IDEA-1997.  The parent agreed and an IEP. Was created with the following determination:**

Based upon the documents reviewed, the student is eligible for special education as a <u>Learning Disabled</u> student.  The student requires specialized instruction in the following area:

**19**

**Math, Reading and Written Expression**. The total number of hours in specialized instruction is **15** hours per week. The student will attend all special subject classes with non-disabled peers. Related services are required in the following areas: **Speech / Language Therapy 1 hour per week**.

**SUMMARY:**

   **Based upon the documents received, the MDT team determined that the student qualifies for special education services under IDEA-1997. The parent agreed and an I.E.P. was created with the following determinations:**

   Based upon the documents reviewed, the student is eligible for special education as a Learning Disabled student. The student requires specialized instruction in the following areas: Math, Reading & Written Expression. The total number of hours in specialized instruction is 15 hours per week. The student will attend all special subject classes with non-disabled peers. Related services are required in the following areas: Speech / Language Therapy 1 hour per Week.

   The following accommodations will be made:

   **Accommodations for the SAT-9 and classroom testing include:** Preferential seating, small group, repeated/restated questions, extended time, frequent breaks.

   After the Multidisciplinary Team Meeting ended, Plaintiff Henneghan was assured by all team members that Plaintiff's child Malcolm Henneghan's IEP will be implemented on the first day of school.

   Plaintiff Henneghan has evidence to prove that the Defendant the District, Schools Principal, Donnie Rutledge, falsified Malcolm Henneghan's IEP on August 26, 2004 by signing and stating that he was a participating member of the Multidisciplinary Team and agreed to the

recommendation contained in the IEP, even though the Principal was not in attendance to participate in the Multidisciplinary Team Meeting where all team members introduced themselves and signed the IEP as a contract agreeing to the contents contained in Malcolm Henneghan's IEP.

On October 13, 2004 (5 weeks after school started) I wrote a letter to my child's teacher stating the following:

"Dear Ms. Clark:, My child Malcolm Henneghan is a Learning Disabled student, Malcolm requires specialized instruction in Math, Reading and Written Expression. On August 26, 2004 (a week before school stated), I met and or spoke with Anthony White School Psychologist, Edith E. Ajaero, Special Ed. Teacher, Vanessa Countee, Social Worker, Leslie J Charles, Speech Pathologist, and Carvella Giles, General Education Teacher. I was informed orally and in writing that Malcolm requires and will receive 15 hours per week of special instruction in Math, Reading and

Written Expression and 1 hour per week Speech and Language Therapy. Additionally, Malcolm requires preferential seating, small groups, repeated/restated directions, extended time, and frequent breaks. At this point, Malcolm should have received over 100 hours of the above mention subjects. I am concerned that my child disabilities are not being address according to what was told and given to me by the above noted people. I am concerned about the level and length of the homework assignments. I am gravely concerned that my child is not getting 15 hours of specialized instructions per week. I would like to meet with you at your earliest convenience to address my concerns."

During the week of October 13, 2004, I met with Ms. N. Clark (my child's 5th grade teacher) regarding the above mention letter. During our meeting, I echoed what the IEP stated

with respects to specialized instruction in Math, Reading and Written Expression and Speech and Language Therapy. I also asked Ms. N. Clark if she read my child's IEP? She said yes. She also mentioned that she was helping Malcolm using phonics. I informed her that without complying with my child's IEP, Malcolm is unable to learn in an environment that's not situated for a learning disabled child. Ms. Clark suggested that I talk to the Principle and Special Education Teacher regarding my child's IEP. Before leaving the school the Principal, Donnie Rutledge, met with me in his office regarding the before mentioned letter. The Principal, Mr. Rutledge told me that he read Plaintiff Henneghan's letter to Ms. Clark and that we need to have a meeting to give me a clear definition of what's in my child's IEP. My response to Mr. Rutledge was that I have a very good understanding of my child's IEP and that my son requires 16 hours a week of Special Education for 13 months. The Principal Mr. Rutledge stated "how does Special Ed. know it will take 13 months of special education services to help my child?" Two months prior to Mr. Rutledge statement, he was illegally squeezing his name onto Malcolm Henneghan IEP falsifying that he agrees to the contents of Malcolm Henneghan's IEP.

Plaintiff Henneghan has evidence to show that the Defendant the District unlawfully retaliated against Plaintiff Henneghan after Plaintiff Henneghan wrote a letter to Malcolm's 5th grade teacher on January 6, 2005 stating "My child requires 16 hours per week for Special Ed. It is my opinion that the faculty and staff at Burrville Elementary have been willingly and unlawfully discriminating against my child by not complying with his IEP. There are no sliding doors or ramps at Burrville Elementary and thus preventing my child to a fair and equal education. By not complying with the IEP, my child is unable to learn and receive a fair education. As his parent, I can say with all honesty that my child has not learned one thing in your class this year. My goal is to seek justice in this matter. Because of Burrville's unlawful

actions, my child is not receiving a fair and equal education. There are about 30 schools hours per week and my child requires 16 hours per week special ed. That's more than 50 percent of his learning. If he is not receiving special ed 60 percent of the time he's at school. Then Burrville Elementary is not complying with the IEP and therefore blatantly discriminating against my learning disable child."

The Defendant the District retaliated against Plaintiff Henneghan after receiving the above noted letter by providing false information regarding a school play Malcolm Henneghan participated in during the week of January 20, 2005. The Principal prevented Plaintiff Henneghan and his family from attending the 5th grade school play because Plaintiff Henneghan advocated on behalf of his learning disabled child.

During the week of January 20th 2005, the 5th graders at Burrville Elementary performed a play. My child was a participant in that play. The play originally started at 9:00am. A party of 4 myself included was going to see my child in the play. The morning before school opened, the weather forecast called for a snowstorm during the day. My mother (one of the party of 4) called Burrville Elementary at 8:30am to confirm the time of the Play because of the weather forecast. The school secretary confirmed that the Play will be changed from 9:00am to 1:00pm. My mother also asked me to called the school again to confirm that it will be held at 1:00pm. I called Burrville Elementary around 8:55am to confirm what my Mother was told. The secretary asked me to hold on the telephone. When she returned to our telephone call as I was on hold, se said "Mr. Rutledge said that the Play will be held at 1:00pm.

At 9:55am, I received a call from the school secretary at Burrville Elementary. She said that the Play will start at 10:00am. I had 5 min. to get to Burrville and see the Play. I arrived at Burrville Elementary at 10:15am. I was instructed to go to the auditorium by the secretary.

When I got their around 10:22am. The 5th grade class was taking their final bow as the Play was over.

When I returned home at 11:00am, I informed my Mother that the Play was over. She could not believe what I was telling her as she got a confirmation that it was over. She could not believe what I was telling her as she got a confirmation that it was at 1:00pm. She immediately called Burrville Elementary to speak to Mr. Rutledge and the secretary told her that he is in a meeting and will return her call. Mr. Rutledge never returned her call.

Plaintiff Henneghan has evidence to show that the Principal, Donnie Rutledge, was forwarded a copy of Plaintiff Henneghan's letter to Malcolm Henneghan's teacher regarding Malcolm's homework assignments. Malcolm Henneghan's 5th grade teacher stated in her response to Plaintiff Henneghan's January 6, 2005 letter "I forwarded copies of your letter to Mr. Rutledge and Ms. Ajaero. They will have to address your concerns about the number of hours of special education instruction that he is receiving".

The Defendant the District never complied with Plaintiff Henneghan child's IEP during the entire 5th grade school year. By not complying with Plaintiff Hennghan child's IEP the Defendant the District willfully and knowingly discriminated against Plaintiff Henneghan's learning disabled child for failing to provide a Free and Appropriate Public Education (FAPE).

The Defendant the District never complied with Plaintiff Henneghan child 's IEP during the entire 2004-2005, 6 grade school year. By not complying with Plaintiff Henneghan child's IEP the Defendant the District willfully and knowingly discriminated against Plaintiff Henneghan's learning disabled child for failing to provide a Free and Appropriate Public Education (FAPE).

Plaintiff Henneghan has evidence to show that on June 7 2005, Plaintiff Henneghan filed a discrimination and retaliation complaint with the U.S. Department of Education Office of Civil Rights OCR Complaint #11-05-1214 against the Defendant the District on behalf of his son Malcolm Henneghan.

In the discrimination complaint filed with the U.S. Department of Education Office of Civil Rights, I stated that DCPS discriminated against my son Malcolm Henneghan based on his disability, Learning Disability (LD). Specifically, I alleged that:

1    DCPS failed to provide my son Malcolm Henneghan a free and appropriate public education (FAPE by failing to implement Malcolm Henneghan Individual Education Program (IEP) at Burrville Elementary School (School) during the 2004-2005 school year.

2    DCPS retaliated against Plaintiff Henneghan (parent) because Mr. Henneghan advocated on behalf of Malcolm Henneghan (son), by changing the time of a School play in January 2005, which denied Plaintiff Henneghan and his family the opportunity to attend.

3    The Student was removed from the special education program at the School sometime prior to August 2004.

4    The School's Principal falsified the Student's IEP from August 26, 2004, by signing and stating that he was a participating member of the Multidisciplinary Team and agreed to the recommendation contained in the IEP, even though the Principal was not in attendance to participate in the Multidisciplinary Team Meeting where all team members introduced themselves and signed the IEP as a contract agreeing to the contents contained in Malcolm Henneghan's IEP.

The Defendant the District never complied with Plaintiff Henneghan child 's IEP during the entire 2005-2006, 7th grade school year.  By not complying with Plaintiff Henneghan child's IEP the Defendant the District willfully and knowingly discriminated against Plaintiff Henneghan's learning disabled child for failing to provide a Free and Appropriate Public Education (FAPE).

On January 27, 2006, The U.S. Department of Education Office of Civil Rights and Dr. Clifford Janey, Superintendent, of the District of Columbia Public Schools entered a Commitment To Resolve Agreement for Complaint No. 11-05-1214 stating:

"In order to resolve concerns identified by the District of Columbia Office of the Office for Civil Rights (OCR) regarding the provision of a free appropriate public education to the Student, who attends Burrville Elementary School (School) within the District of Columbia Public Schools (DCPS), DCPS enters into the following Commitment to Resolve (CTR).  DCPS voluntarily commits to implement the following actions.  This agreement neither constitutes any finding by OCR that DCPS has discriminated or otherwise engaged in any wrongdoing, nor any admission by DCPS of any discrimination or wrongdoing.  Implementation of the following commitments will resolve OCR's concerns related to the complaint.

Commitments:  DCPS shall evaluate the Student to determine how much specialized instruction in reading, math, and written expression the Student needs to compensate for the services not provided during the 2004-2005 school year, and shall provide this specialized instruction, as well as a minimum of 16 hours of speech language therapy, in addition to those services already being provided to the Student.  The services may be provided during the regular school year and/or through an extended school year program.

DCPS shall ensure the Student receives the specialized instruction and speech language therapy provided in the Student's Individualized Education Program (IEP) for the 2005-2006 and 2006-2007 school years. DCPS will log all hours of specialized instruction and speech language therapy that the Student receives on a daily basis and maintain such records.

Further, DCPS will provide documentation and a narrative of the process used to determine whether 16 hours of speech language therapy is sufficient to compensate for the services not provided or whether additional hours are needed, and a plan as to how DCPS will provide this therapy.

Reporting:    Within 30 calendar days of signing this CTR, DCPS shall provide the name, title, and telephone number of the person(s) designated to provide specialized instruction and speech language therapy to the Student.

Within 30 calendar days of signing the CTR, DCPS will provide OCR documentation and a narrative of the process used to determine how much specialized instruction the Student needs to compensate for the services not provided during the 2004-2005 school year. These plans are to provide start and finish times; the length of time that specialized instruction and speech language therapy will be provided to the Student; and information on how any missed time will be made up and by whom. This instructions is to be completed by September 1, 2006.

On April 15, 2006, July 15, 2006, October 15, 2006, January 16, 2007, April 15, 2007, and July 15, 2007, DCPS will provide OCR with signed and dated logs of the specialized instruction and speech language therapy provided the Student during the three-month period prior to the submission of the logs, evidencing the provision of both the services called for in the Student" current IEP and those services due the Student from the 2004-2005 school year.

27

From the date of the CTR until July 15, 2007, DCPS will provide OCR with copies of all IEP's developed for the Student, along with any addenda.

Plaintiff Henneghan has evidence to show that the Defendant the District retaliate against Plaintiff Henneghan for being an advocate for his learning disabled child by not providing information or reports showing special education classes or schedules for Malcolm Henneghan during the 2005-2006 7th grade school year.

Plaintiff Henneghan has evidence to show that during the 2007-2008 8th grade school year the Defendant the District retaliated against Plaintiff Henneghan for being an advocate for his learning disabled child by mailing critical information regarding Special Education Service to an address Plaintiff Henneghan does not reside, in an attempt to make it appear that Plaintiff Henneghan provided false information for his home address, and telephone number. Even after Plaintiff Henneghan contacted the Defendant the District in writing and by telephone stating that the Defendant is mailing critical information to an address that the Plaintiff does not reside. The Defendant the District continued to mail critical information by regular mail and certified mail to an address that Plaintiff Henneghan does not reside.

As a direct result of Plaintiff Henneghan advocating on behalf of his child regarding special education services and for filing complaints against the Defendant with the U.S. Department of Education Office of Civil Rights for discrimination and retaliation Plaintiff Henneghan has evidence to show that the Defendant the District retaliated against Plaintiff Henneghan by preventing Plaintiff Henneghan from viewing a vicious assault on a surveillance camera against Plaintiff son Malcolm Henneghan committed on October 18, 2007 at the Defendants school which led to the arrest and guilty plea of a juvenile who attends the same school as Malcolm Henneghan.

On October 18, 2007, Plaintiff Henneghan child Malcolm Henneghan was brutally attacked at school. Plaintiff Henneghan wrote Michelle A. Rhee, Chancellor, District of Columbia Public Schools, Ms. Sheena F. Tuckson, Principal, Kelly Miller Middle School DCPS and The Honorable Adrian M. Fenty, Mayor of Washington DC stating:

"Yesterday, Thursday, October 18, 2007, my child Malcolm Henneghan, a 8th grade student at Kelly Miller, was assaulted by another student Greg Jackson (student at Kelly Miller) on the school grounds in the lunchroom during normal school hours (between 11:30 and 12:00 noon).

On Thursday, October 18, 2007, between the hours of 11:30am and 12:00 noon, my child Malcolm Henneghan was in the lunchroom talking to a friend when Greg Jackson (student at Kelly Miller) walked up to Malcolm and told him that he was going to punch him in the face. Malcolm asked Greg Jackson why? Greg then punched my child in the left side of his face. Malcolm ask him why again and then Greg hit Malcolm as hard as he can again in the left side of my child's face. Malcolm immediately began to cry and cover his face up. A staff member who works in the office saw the incident and took my child to the office and thus I was called by the school nurse to come and get my child because he was hit in the face and had a red bruise.

When I arrive to the school about 15 minutes after I was notified of the incident. I saw my child sitting in the office with a bag of ice covering the left side of his face. I immediately asked to speak to the Principal, Assistant Principal, a Counselor, or someone who can report to me what was going to happen to the child that attacked my child. At that time a female Assistant Principal and a male Assistant Principal introduced themselves and told me that they were taking care of the situation. I asked both of them, what is the school policy regarding violence? The female Assistant Principal said expulsion and if I want to press charges, I have to contact MPD

**29**

(Metropolitan Police Department).  I said I want to press charges and whatever the school policy is regarding violence with respect to a child being attack, I want the school to adhere to those policies.  I then told both Assistant Principals that I will be sending the school something in writing regarding the above noted events to assure that my child rights are protected and that he can continue to come to school without fear of being attacked again by Greg Jackson(student at Kelly Miller).

After arriving home, the left side of my chil's face was very swollen and he had blood coming out of his left ear.

Assault is either the intent to commit battery, or the arousal of fear of bodily harm in another person, in a manner other than by the use of words.  In some states the attempt to commit battery must be accompanied by the "present ability to succeed" (i.e. the means with which to actually inflict bodily harm.)

In medical terminology, blunt trauma, blunt injury, non-penetrating trauma or blunt force trauma refers to a type of physical trauma caused to a body part, either by impact, injury or physical attack; the latter usually being referred to as blunt force trauma.  The term itself is used to refer to the precursory trauma, from which there is further development of more specific types of trauma, such as contusions, abrasions, lacerations, and/or bone fracturing.

Blunt Force Trauma to the head mya cause sever injury to the brain and could be life threatening or could be fatal.

Greg Jackson Assault on my child was unprovoked, his intentions was to cause sever bodily harm to my child by punching him in the left side of his face.  After the first brutal punch to my child's head, Malcolm asked Greg why and Greg proceeded to severely injure my child by brutally punching him in the left side of his face again.  Greg Jackson intended to cause sever

bodily harm to my child. Greg Jackson intended to use blunt force to my child head to cause severe injury. That was Malicious Intent.

I have eye witnesses to the assault. The Assault happened on school property during normal school hours. In saying that, I am requesting and demanding that Greg Jackson be arrested and charge with Assault with the intent to cause bodily harm to my child. Since this happen during normal school hours on the grounds of the school, I hereby request and demand that DCPS contact the Metropolitan Police Department and report the assault on my child by Greg Jackson (student at Kelly Miller) and have him arrested for Assault with the intent to cause severe bodily harm.

In closing, I would also, want to request and demand an investigation regarding the above noted incident. With regards to any medical problems as a result of Greg Jackson's assault on my child. I will hold DCPS and the Parents of Greg Jackson responsible and liable for any damages incurred as a result of this malicious attack on my child."

As a direct result of Plaintiff Henneghan advocating on behalf of his child regarding special education services and for filing complaints against the Defendant with the U.S. Department of Education Office of Civil Rights for discrimination and retaliation Plaintiff Henneghan has evidence to show that the Defendant the District retaliated against Plaintiff Henneghan by not contacting the District of Columbia Metropolitan Police to report the assault/crime.

As a direct result of Plaintiff Henneghan advocating on behalf of his child regarding special education services and for filing complaints against the Defendant with the U.S. Department of Education Office of Civil Rights for discrimination and retaliation Plaintiff Henneghan has evidence to show that the Defendant the District retaliated against Plaintiff

Henneghan by not contacting the Emergency Medical Service after my child was brutalized in a violent attack on the grounds of DCPS which resulted in the arrest and guilty plea of the student who committed the crime.

On Wednesday, November 27, 2007, I received a telephone call from a D.C. Metropolitan Police Officer at Kelly Miller Middle School DCPS. The Police Officer said that the District Attorney wants to meet Malcolm at her office located in downtown DC.

Plaintiff Henneghan gave the Police Officer permission to take my child to meet the District Attorney.

Plaintiff Henneghan spoke to his son before they went to the District Attorney's Office and told Malcolm that the District Attorney wanted to meet you and that everything will be OK.

However, when Plaintiff Hennehan's son arrived at the Office of the Attorney General, the Defendant the District including the Office of the Attorney General which is a Division of the District discriminated against Plaintiff Henneghan's learning disable child by showing Malcolm Henneghan the surveillance tape of him being attacked and asking him to explain what was going on while he watches the brutal attack against him. The Defendant the District never received permission from Plaintiff Henneghan the parent to show his learning disable son a vicious surveillance tape of him being attacked. The Defendant the District discriminated against Plaintiff Henneghan's learning disabled child by providing no standard of care with regards to accommodating his learning disabilities.

On Wednesday, November 7, 2007, Plaintiff Henneghan wrote a letter to Linda Singer, Attorney General, Office of the Attorney General, Government of the District of Columbia stating:

"My name is Godfrey Henneghan. I am the parent of Malcolm Henneghan a 13 year old student at Kelly Miller Middle School (DCPS) located in Washington D.C.

Today around 11:00am, I received a telephone called from a Police Officer located at Kelly Miller Middle School. The Police Officer said "The District Attorney wantss to talk to Malcolm" in her office at 1:30pm to talk to him regarding an incident at school where he was brutally attacked by another student. He wanted to know if it was OK to take my child to your office. I gave the Officer permission to take my child to your office to meet with you.

Between the hours of 2:00 and 2:30pm, I received a telephone call from Barbara Chesser, Assistant Chief for Preparing Juveniles. She stated that after talking to Malcolm regarding the incident on October 18, 2007 where he was attacked by another student at school, that Malcolm told her that he forgot and don't remember what happened to him that day. Ms. Chesser also stated that the incident is on videotape and that it appears that Malcolm hit the alleged assailant and it appeared that they were simply fighting. Ms. Chesser stated that the videotape shows Malcolm hitting the alleged assailant making it hard to prove a crime was committed. Additionally, Ms. Chesser stated that her office could probably charge the assailant for the last blow. Ms. Chesser gave me two options. These options included some type of Mediation whereby I could monitor and have more control over the outcome of the student who attacked my child the other was to go ahead with charging the assailant and having him deferred without my control.

After confirming that there is a videotape through the telephone conversation I had with Ms. Chesser, I asked her for a copy of the videotape? She told me that the videotape is the property of DCPS and that I cannot have a copy. I then asked to view the videotape of my child

being attacked. Ms. Chesser said that after they charged the student who attacked my child, she will show me the tape.

Ms. Chesser also made me aware that because the videotape shows Malcolm (my child) hitting the alleged assailant, it's going to be hard proving the case. I told Ms. Chesser that the videotape could be miss-leading and that there are witnesses to corroborate the attack that's on tape. I requested that she interview witnesses to get a clear understanding as to what happen. Ms. Chesser said it would be very hard to get witnesses to come down to her office and give statements with regards to what happen on the day of the incident.

I also, told Ms. Chesser that how could she get a statement from a child that was hit in the head several times and to expect him to describe to her in detailed as to what happen the day he was attacked. I also, asked Ms. Chesser how could she get statements from my child without legal representation. She stated that by me allowing Malcolm to come down to the District Attorney's Office that I waived his rights to representation and that they can ask him anything they want.

Our telephone conversation ended by me telling Ms. Chesser that I do not want Mediation I want the alleged assailant charged. Ms. Chesser asked me if she can asked Malcolm the names of the witnesses? I told her no. I asked her how can she ask Malcolm for names of witnesses of the attack when she told me previously that Malcolm said he does not remember what happen to him. I then told her that all the witnesses can be identified by looking at the videotape. Our call ended.

Five minutes later, Ms. Chesser called me back and asked if I could meet with her and the Police Officer tomorrow in her office at 10:00am. I told her no but I could meet with her at 2:00pm she agreed and the conversation was over.

Later that afternoon around 3:15pm, I picked my child up from school and asked him what happen when he went to the District Attorney's Office. He said they showed him the CD with the videotape of the alleged incident the guy showing the videotape asked Malcolm to explain what happen.

I immediately got very upset. I never gave the District Attorney's Office permission to show my child a videotape of him being attacked and having him explain what happen to him while he watched the attacked on videotape. My child was not afforded legal representation for having the District Attorney's Office interrogate him regarding an attacked that happened to him. By me allowing my child to come to the District Attorney's Office in no way waived my rights or my child rights to legal representation. By allowing my child to come to the District Attorney's Office in no way gave the District Attorney permission to show my child such a vicious attack of him on videotape without my permission or consent. This type of witness tampering is very intimidating to my child and there was not standard of care given the fact that he is a minor and a learning disabled child. Malcolm stated to me that he was sick on his stomach after watching that videotape and he wanted to know why they made him watch it.

At no time during my conversation with Ms. Chesser did she make me aware that my child viewed the videotape of the attack on him. Ms. Chesser told me that I cannot have a copy of the videotape because it belongs to DCPS. Ms. Chesser told me that after a charge is filed on the assailant, she will let me see the videotape. The District Attorney's Office showed my child the videotape of the attack on him without charging the assailant and my child is a minor but wont let me see the videotape unless a charge is filed (The District Attorney's Office will let a child see an attack on him but wont let the parent see the attack unless certain parameters are met

35

but no parameters for the minor). This is tantamount to witnesses intimidation by the Attorney Generals Office.

In closing, I would like to request an investigation of your office with regards to interrogating my son, who is a minor child and after showing him the videotape of an attack on him without affording him the right to legal representation. I would also like to know how does a parent file a complaint against your office for intimidating my child who is a witness to an attack on him by showing him the videotape without any standard of care given to my minor child and without my consent or legal representation? Please respond in writing.

A crime was committed against my child at Kelly Miller Middle School. Witnesses can be obtained by viewing the videotape. Anyone who is on the videotape students, faculty and staff, police and security are potential witnesses. Please prosecute this case to the full extent of the law and let justice prevail."

The Defendant the District never responded to Plaintiff Henneghan's letter to the Office of the Attorney General.

The Defendant the District never responded to Plaintiff Henneghan's letter to Michelle A. Rhee, Chancellor, District of Columbia Public Schools, Ms. Sheena F. Tuckson, Principal, Kelly Miller Middle School DCPS and The Honorable Adrian M. Fenty, Mayor of Washington DC.

On February 28, 2008 Plaintiff Henneghan received a call from Sheila Seshadri, Asst. Attorney General for the District of Columbia. Sheila Seshadri informed me that a trial date has been set for March 3, 2008 regarding the assault on my child. Ms. Sheila Seshadri wanted to know if I would allow my child to testify.

Plaintiff Henneghan asked Ms. Sheila Seshadri if they were going to show the surveillance tape at trial and Ms. Sheila Seshadri said probably not.

Plaintiff Henneghan informed Ms. Sheila Seshadri that Plaintiff's child Malcolm Henneghan is learning disabled and one of his impairments is speech and that if he is subjected to cross examination he could get very confused and shutdown. Plaintiff Henneghan also mentioned to Ms. Sheila Seshadri that Malcolm did not learn how to talk until he was five years old and that he has only been talking for 8 years and that the court would have to accommodate his handicaps. I told her if she does not show the surveillance tape as to what happen to my child during that vicious attack that I will not let him testify.

On February 29, 2008, Plaintiff Henneghan's son Malcolm Henneghan was subpoenaed to appear in court at the Superior Court of the District of Columbia, Family Court case number J 63-08 to testify on March 3, 2008.

On Sunday, March 2, 2008, Plaintiff Henneghan contacted the Judges Chambers for Family court at the Superior Court of the District of Columbia case number J 63-08 Room JM-5 leaving a voicemail message objecting to having my child subpoenaed to testify as a witness to the vicious attack on him at DCPS on October 18, 2007.

The reason Plaintiff Henneghan objected to having his son Malcolm Henneghan subpoenaed to testify was because the Prosecutor, Asst. Attorney General, Ms. Sheila Seshadri said that they probably will not show the tape of Malcolm being attacked. Plaintiff Henneghan also mentioned to the voicemail in the Judges Chambers that DCPS and the District of Columbia Office of the Attorney General are refusing to show Plaintiff Henneghan the surveillance tape of my child being attacked. Plaintiff Henneghan also stated on the voicemail in the Judges Chambers that Plaintiff Henneghan's son is learning disabled and that the District of Columbia Office of the Attorney General is disregarding my child's impairments and that one of his

handicaps is speech and that Section 504 of the Rehabilitation Act and the Americans With
Disability Act are Federal laws that says my child disabilities must be accommodated.

On March 3, 2008 Plaintiff Henneghan and his son Malcolm Henneghan appeared in
court as Malcolm was subpoenaed to testify.

When the trial started, the District Attorney asked Plaintiff Henneghan if Malcolm is
ready to testify. Plaintiff Henneghan stated to the District Attorney that I contacted the Judges
Chambers over the weekend and objected to having Malcolm testify. Plaintiff Henneghan stated
to the District Attorney that he has not seen the videotape of my child being attacked. Plaintiff
Henneghan also stated that my child is learning disable and that Section 504 of the Rehabilitation
Act and the Americans with Disabilities Act states that his disabilities must be accommodated.
Plaintiff Henneghan also stated that the Prosecutor is trying not to show the videotape and have
my learning disable child testify without any regards to his disabilities with respect to Plaintiff
Henneghan's son being cross examine without accommodating his disabilities.

The Judge presiding over the trial asked to speak to Plaintiff Henneghan to find out why
Plaintiff Henneghan is objecting to having his son testify.

Plaintiff Henneghan told the Judge that Plaintiff's son is learning disable and that one of
his impairments is speech and that Plaintiff's child did not start talking until he was five and that
he has only been talking for 8 years. Plaintiff Henneghan stated to the Judge that Plaintiff's son
requires 15 hours a week for Special Education for math, reading, written expression and speech.
Plaintiff Henneghan also stated that Section 504 of the Rehabilitation Act and the Americans
with Disabilities Act federally protects Malcolm and that his disabilities must be accommodated.

The Judge ordered a continuance so that Malcolm can be examined by a Court appointed
Doctor to see if Malcolm is capable of testifying.

The Judge ordered the Prosecutor to show Plaintiff Henneghan the tape of the attack on Malcolm Henneghan.

The Judge ordered that Malcolm be seen by Dr. Todd Christiansen on March 4, 2008 to see if Malcolm could testify.

The Defendant the District finally showed Plaintiff Henneghan the videotape of the attack on Malcolm Henneghan which happened at Kelly Miller DCPS on October 18, 2007. It took the Defendant the District 4 months after the assault on my child to show Plaintiff Henneghan the tape.

The Defendant the District retaliated against the Plaintiff for advocating for his son's disabilities by refusing to show Plaintiff Henneghan the attack on his child even after the Defendant the District illegally show it to my child without my permission and consent and without accommodating my child learning disabilities.

On March 4, 2008 Plaintiff Henneghan's son was seen by Todd Christiansen, a physician appointed by the courts to examine Malcolm to see if he can testify.

Todd Christiansen stated that Malcolm could testify but he must be accommodated by giving him as much time as he needs to answer a questions, by making sure Malcolm understands the question, by giving Malcolm repeated breaks and additional time to respond to questions.

On March 6, 2008, Greg Jackson (the person who attacked Malcolm) changed his plea from innocent to guilty and was sentence on March 31, 2008

I have been documenting all of the issues regarding services my child needs for special education since he has been enrolled in DCPS. I have been complaining about services he has

not been receiving from DCPS since 2003. I have been complaining in writing to DCPS that they have been discriminating against my learning disabled child since 2003 up until now.

In closing, Plaintiff "Henneghan" pro se litigant acknowledge this Honorable Court high standards with respect to the court's processes for filing pleadings with this Honorable Court. Plaintiff in good faith has submitted strong evidence to support arguments proving that the Defendant the District knowingly and willfully discriminated and retaliated against Plaintiff Henneghan and his learning disable son.

With respects to the high standards used to file, submit, and or amend pleadings to this Honorable Court, Plaintiff Henneghan has in good faith submitted pleadings and or arguments and strong evidence regarding the Defendants the District unlawful actions. It is with these pleadings/arguments in association with Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Title VII of the Civil Rights Act with respect to retaliation for filing charges against the Defendant the District.

## COUNT 1

(Section 504 of the Rehabilitation Act of 1973)

The Plaintiff incorporates by reference all previous allegations

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by removing Malcolm Henneghan out of Special Education without Plaintiff's Henneghan's knowledge or consent.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 5th grade 2004-2005 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 6 grade 2005-2006 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 7th grade 2006-2007 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 8th grade 2007-2008 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not contacting the District of Columbia Metropolitan Police for a vicious attack that happen at DCPS a Division of the District.

The Defendant the District discriminated against Plaintiff Hennehan's son Malcolm Henneghan by not contacting Emergency Medical Services after a vicious attack was committed against him.

The Defendant the District discriminated against Plaintiff Henneghan's son by showing him a videotape of him being attack and having him explain what happen to him while he watches the attack without providing any standard of care or provisions for his handicaps and without permission and consent from Plaintiff Henneghan his parent.

Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits recipients of federal financial assistance from excluding qualified individuals with disabilities from participation in federally assisted programs or activities solely on the basis of the disability, 29 U.S.C. § 794a.

A public entity is required to make reasonable modification in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R § 35.130(b)(7).

Malcolm Henneghan is an "individual with a disability" in speech, reading, written expression and math which substantially limits one or more major life activities.

Malcolm Henneghan is "otherwise qualified" to attend school at Kelly Miller Middle School in that he is of the age and grade level in which children without disabilities attend the school.

The Defendant the District is a recipient of federal financial assistance.

The Defendant the District has discriminated against Malcolm Henneghan solely by reason of his disability by excluding him from and denying him participation in a federally funded program.

The Defendant the District has refused to modify its policies, practices, or procedures, thereby intentionally discriminating on the basis of disability.

As a direct result of the Defendant the District actions, Malcolm Henneghan has been deprived of public educational services offered to children without disabilities. Malcolm Henneghan has suffered, and is continuing to suffer, irreparable harm due to the deliberate, intentional, wanton, willful, and outrageous discriminatory actions of the Defendant the District.

As a direct result of the Defendant the District actions, the Plaintiff son Malcolm Henneghan has suffered embarrassment, humiliation, emotional distress, and other injuries and has incurred actual damages in an undetermined amount.

## COUNT II

### (Title II of the Americans with Disabilities Act)

The Plaintiff incorporates by reference all previous allegations

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by removing Malcolm Henneghan out of Special Education without Plaintiff's Henneghan's knowledge or consent.

**42**

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 5th grade 2004-2005 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 6 grade 2005-2006 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 7th grade 2006-2007 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not implementing and complying with his 8th grade 2007-2008 IEP.

The Defendant the District discriminated against Plaintiff Henneghan's son Malcolm Henneghan by not contacting the District of Columbia Metropolitan Police for a vicious attack that happen at DCPS a Division of the District.

The Defendant the District discriminated against Plaintiff Hennehan's son Malcolm Henneghan by not contacting Emergency Medical Services after a vicious attack was committed against him.

The Defendant the District discriminated against Plaintiff Henneghan's son by showing him a videotape of him being attack and having him explain what happen to him while he watches the attack without providing any standard of care or provisions for his handicaps and without permission and consent from Plaintiff Henneghan his parent.

Title II of the ADA governing state and local governmental entities protects persons from discrimination on the basis of disability by public entities. 42 U.S.C. §§ 12131-12165

Title II of the ADA defines a public entity in pertinent part as any state or local government, department, agency, special purpose district, or other instrumentality of a State or local government 42 U.S.C. § 12131(1).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity or be subject to discrimination by any such entity." 42 U.S.C. § 12132

Title II of the ADA's implementing regulations require that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with a disability. " 28 C.F.R. § 35. 130(d).

Title II of the ADA's implementing regulations affirmatively require public entities to modify their practices, polices, and procedures as necessary to avoid discriminating against individuals with disabilities.

The Defendant the District is a political subdivison of the state and is subject to Title II of the ADA.

The Defendant the District has intentionally discriminated against Plaintiff son Malcolm Henneghan by refusing to modify its policies to allow him to participate in and benefit from the service that provides to persons without disabilities.

The Defendant the District has intentionally discriminated against Plaintiff son Malcolm Henneghan by refusing to administer services, programs, and activities in the most integrated setting appropriate to the needs of a qualified individual with a disability.

As a direct result of the Defendant the District actions, the Plaintiff son Malcolm Henneghan has been deprived of the public educational services offered to children without disabilities in the most intergrated setting appropriate to his needs. The Plaintiff has suffered and is continuing to suffer, irreparable harm due to the deliberate, intentional, wanton, willful, and outrageous discriminatory actions of the Defendant the District.

As a direct result of the Defendants the District action, the Plaintiff son Malcolm Henneghan has suffered embarrassment, humiliation, emotional distress, and other injuriews and has incurred actual damages in an undeterminded amount.

## COUNT III

### (Declaratory Relief)

The Plaintiff incorporates by reference all previous allegations.

In light of the foregoing, the Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, stating that the Defendant's conduct as alleged above is illegal and violates Malcolm Henneghan's federally guaranteed rights.

## COUNT IV

### Retaliation  Violation of Title VII of the Civil Rights Act of 1964

The Plaintiff incorporates by reference all previous allegations.

The Defendant the District retaliated against Plaintiff Henneghan by preventing Plaintiff Henneghan and his family from seeing a the 5th grade school play that Malcolm performed in because Plaintiff Henneghan advocated for his learning disabled son.

The Defendant the District retaliated against Plaintiff Henneghan by not responding to Plaintiff Henneghan's request for an investigation regarding the October 18, 2007 letter sent to the Defendant the District with respect to an attack on my child which led to an arrest and a guilty plea by the person who attacked my child.

The Defendant the District retaliated against Plaintiff Henneghan by refusing to show Plaintiff Henneghan the surveillance tape of his son being attacked but showed it to his minor child without permission or consent.

The Defendant the District retaliated against Plaintiff Henneghan by not responding to

Plaintiff Henneghan's letter to the District of Columbia Office of the Attorney General a

Division of the District with respect to unlawful actions taken by the Attorney General's Office.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by a jury.

WHEREFORE, Plaintiff respectfully requests that the Court deny the Defendants Motion

To Dismiss.

Respectfully Submitted

Godfrey D. Henneghan

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**GODFREY D. HENNEGHAN**                    *

        **Plaintiff(s)**                    *

          **vs.**                    *          **Civil Action No.   07-2173 (HHK)**

**DISTRICT OF COLUMBIA**                    *

        **Defendant(s)**           *****


### CERTIFICATE OF SERVICE

I certify that a true and correct copy of Plaintiff **RESPONSE TO DEFENDANT'S**

**MOTION TO DISMISS** was served by first class U.S. Mail, postage prepaid, this 12th day of

May 2008, on Defendant, address as follows:


        PETER J. NICKLES
        Interim Attorney General for the District of Columbia

        GEORGE C. VALENTINE
        Deputy Attorney General, Civil Litigation Division

        Maria L. Merkowitz
        Senior Litigation Counsel
        441 4th Street N.W.
        Sixth Floor South
        Washington, D.C.  20001
        202-442-9842